**Mildred COHEN, Plaintiff,**

v.

**PRUDENTIAL–BACHE SECURITIES, INC., and Diane James, Defendants.**

**No. 88 CIV. 3448 (SWK).**

United States District Court, S.D. New York.

May 16, 1989.

---

Moser & Henkin by Norman E. Henkin, Alice P. Henkin, New York City, for plaintiff.

Hertzog, Calamari & Gleason by Loretta A. Preska, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This action is brought to recover damages for alleged violations of the federal securities laws and various related state laws, including common law fraud, breach of contract and breach of fiduciary duty. More specifically, plaintiff sues for (1) violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and the associated Rule 10b–5 promulgated by the S.E.C., (2) violations of section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*, (3) violations of section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, (4) breach of oral contract, (5) common law fraud, (6) breach of fiduciary duty, and (7) violations of section 352–c of the New York General Business Law (the "Martin Act"). Defendants have moved to dismiss the complaint (1) for failure to state a claim under section 10(b) and Rule 10b–5, (2) for failure to comply with the one-year statute of limitations under section 12(2), (3) for failure to state a claim under section 17(a) and, assuming success on the above, (4) for lack of pendent jurisdiction as to the state law claims.

## BACKGROUND

In her amended complaint,[1] plaintiff alleges that defendant James defrauded her by making material misrepresentations and omissions, as well as by engaging in other deceptive or manipulative activity. Plaintiff, who has no financial training and who retired in 1979, lives on a fixed income of approximately $30,000 a year. At some point in the 1970's plaintiff was introduced by telephone to Diane Capaccio, who later changed her name to Diane James, and who served as financial advisor and securities broker to plaintiff. At this time, plaintiff advised James that her primary investment objective was to make safe investments and to maximize annual yield without jeopardizing her capital. James was working for the Shearson Company at the time plaintiff first met her, but even after James moved to a position with E.F. Hutton, she continued to act as plaintiff's advisor and broker, regularly speaking with her by telephone, encouraging plaintiff to rely on her investment advice, and recommending investments in securities. James acted as broker on the transactions she recommended. James continued to advise plaintiff and act as her broker after James relocated to California and began working for defendant Prudential–Bache Securities, Inc. ("Prudential"). Plaintiff continued to rely on James at all times.

In February, 1986, James urged plaintiff to liquidate certain securities held in plaintiff's Prudential portfolio and in that month James did so. In April of that year, James "repeatedly and very strongly urged" plaintiff to invest in a Texas limited partnership known as the CSH–1 Hotel Limited Partnership ("CSH–1"). Plaintiff alleges on information and belief, based on promotional materials obtained, that Prudential acted as the "special limited partner" and promotor of CSH–1. James informed plaintiff verbally [when??] that investment in CSH–1 was appropriate in light of plaintiff's investment objectives. James told plaintiff that she could expect a very strong cash flow without risk, but that she needed to act quickly so as not lose the opportunity. Plaintiff received an undated memorandum from defendants that stated in part: *"TIMELY AND URGENT —PLEASE REVIEW NOW!!! UNITS ARE ONLY A FEW LEFT!"* The memorandum also promised a tax-free return of 13.4% and stated that investors placed only

---

1. The facts are drawn from this amended complaint and are deemed true for the purposes of the motions to dismiss. The Court has not relied on materials outside the complaint, submitted previously in connection with a motion to amend the complaint.

$7,744.50 at risk before "write-offs", while noting "NO $ AT RISK at any time with write off + cash returned before sale".

In a telephone conversation with plaintiff in April, 1986, James told plaintiff that the monies already in her Prudential account would be sufficient for the entire CSH–1 investment and that the total investment by plaintiff would not be greater than $8500. No mention was made of the need to make any future payments. James, working through Prudential, forwarded a number of documents to plaintiff for her signature. Without understanding the nature of the documents and on the advice of James, plaintiff signed these papers and returned them to Prudential at some point prior to April 25, 1986. She did not make copies and Prudential did not send her any. James later informed plaintiff that payment for the CSH–1 investment was made from her Prudential portfolio. In November of 1986 and May of 1987, plaintiff made payments of $2,984.25 and $3,087.75, respectively, concerning CSH–1 after such payments were demanded. In October, 1987, the Note Collection Department of Manufacturers Hanover Trust Company demanded payment of $8500 respecting CSH–1, but plaintiff did not understand nor pay. On October 23, 1987, plaintiff began receiving notices from the Fireman's Insurance Company of North America demanding payment, advising her that she had signed a promissory note guaranteed by Fireman's Insurance and that she was in default. The note she allegedly signed obligates plaintiff to pay $54,000 plus 11.2% on unpaid principal, for a total of $84,-752.50 through 1991.

Plaintiff claims that defendants never informed her that CSH–1 was a tax shelter designed for high income-bracket persons, inappropriate for investors with moderate fixed income, and that the investment was risky. Plaintiff's counsel became aware of these facts upon receipt of the CSH–1 Subscription Agreement in January, 1988. Plaintiff claims her investment is at risk, especially in light of threats by Fireman's Insurance to sell plaintiff's shares. Plaintiff also asserts that neither defendant ever asked her for a statement of her income, assets or net worth, and never discussed tax shelters with her.

Plaintiff further alleges, on information and belief, that on or about April 25, 1986, James filled out an investor questionnaire form for plaintiff showing plaintiff's gross income (actual or projected) in excess of $100,000 for each year from 1984 through 1989, indicating that thirty percent of her income came from salary, and showing a net worth of $1,180,000. Plaintiff bases this allegation on a copy of the investor questionnaire provided to her counsel by Fireman's Insurance, and plaintiff's conclusion that the handwriting on the form is not plaintiff's, but instead that of James. Plaintiff, after retiring in 1979, states she has earned no salary and receives only $30,000 per year, with a net worth between $90,000 and $150,000. Plaintiff alleges that, at these salary levels, she would not have been accepted for investment in CSH–1.

Plaintiff never authorized James to use these figures or to act as her amanuensis for such purpose. Plaintiff, whose signature purportedly appears at the bottom of the questionnaire, claims that she never signed this questionnaire. In addition, the signature page bearing plaintiff's purported signature was allegedly notarized on April 25, 1986 in California. Plaintiff claims to have been in New York at that time, did not authorize the notarization and was never in California at any relevant time. Moreover, plaintiff alleges, on information and belief, that her signature was also forged on an Investor Bond Indemnification and Pledge Agreement dated April 25, 1986. This agreement was allegedly required before a purchase in CSH–1 would be allowed. Plaintiff claims she never received any income from CSH–1.

## DISCUSSION

### I. Section 10(b) Claim

Defendants attack plaintiffs' first claim in a few ways. Defendants generally attack the pleadings, at certain points, for failing to plead fraud with the particularity required by Fed.R.Civ.P. 9(b). Defendants

then proceed to attack plaintiff's complaint for failure to state a claim by critically analyzing each element of paragraph 45 of the complaint, at which plaintiff states:

Defendants intentionally or with gross recklessness misrepresented material facts and omitted to state material facts and used manipulative or deceptive devices or contrivances, such as:

  a. failing to advise plaintiff of the riskiness of the investment or the extent to which she would be at risk by making the investment in CSH–1 at issue herein;

  b. verbally misleading plaintiff as to the amount of money she would be investing in CSH–1;

  c. transmitting to plaintiff numerous papers and advising and urging her to sign them although the papers in issue contained many blanks and gaps;

  d. recklessly failing to make any inquiry as to plaintiff's assets and income or source of income;

  e. filing in false and grossly exaggerated statements concerning plaintiff's assets and income on an "Investor Questionnaire";

  f. forging plaintiff's signature on an "Investor Bond Indemnification and Pledge Agreement";

  g. without plaintiff's authority, notarizing or causing to be notarized a signature purporting to plaintiff's signature in California at a time when plaintiff was in New York.

Defendants attack each of these subparagraphs as if each were a separately alleged cause of action. Plaintiff has not organized her complaint in this way and admits that each allegation above does not state a claim standing alone. The Court notes that plaintiff alleges only one claim for violation of section 10(b) and Rule 10b–5, and thus the Court will not dismiss this claim if any theory of liability is properly alleged. Dismissal in a Rule 12(b)(6) motion is not proper unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–6, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

Plaintiff suggests in her Memorandum of Law that two types of fraudulent acts are alleged: the first involves material misrepresentations and omissions upon which plaintiff relied to her detriment and the second involves deceptive and manipulative acts that in fact caused harm to plaintiff. Plaintiff has also responded to each of defendants' specific attacks on the allegations in paragraph 45. Reading the complaint as a whole, as the Court should, *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 562 (2d Cir.1985) (citing *Conley v. Gibson, supra,* 355 U.S. at 47–8, 78 S.Ct. at 102–03), the Court concludes that plaintiff has stated a claim under section 10(b) for which relief can be granted.

## A.  *Misrepresentations or Omissions*

In order to state a claim under section 10(b), the plaintiff must allege (1) material misstatements or omissions, (2) indicating an intent to deceive or defraud (scienter), (3) in connection with the sale or purchase of any security, (4) upon which the plaintiff detrimentally relied. *See Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986); *Jaksich v. Thomson McKinnon Securities,* 582 F.Supp. 485, 493 (S.D.N.Y.1984). Plaintiff has done so here. Plaintiff alleges that her longstanding investment advisor and broker advised and cajoled her to invest in CSH–1. In order to induce plaintiff's investment, James allegedly told plaintiff that the investment would be risk-free, would not require more than $8500 of her monies and that she could expect a significant tax-free return. A memorandum on the investment confirmed these representations. At the same time, James failed to inform plaintiff that CSH–1 was a high risk tax shelter, designed for investors with significant amounts of income and assets.

### 1.  Materiality and Related Factors

A primary issue presented is whether or not these alleged representations and omissions are material. Statements and omissions are material if the information would

have had actual significance in the investor's decision-making. *Harkavy v. Apparel Industries,* 571 F.2d 737, 741 (2d Cir. 1978). A fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, ——, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988); *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The disclosures concerning riskiness, suitability and the essential nature of the investment would certainly have altered the total mix of facts available to plaintiff, and the information misrepresented or omitted would have actual significance to the reasonable investor.

█ Defendants argue that these misrepresentations were not material as a matter of law since the statements amount to no more than mere puffery. As this Court has explained:

> Courts have recognized a category of statements by brokers which are better characterized as 'puffery' than as material misstatements. When a broker calls a bond 'marvelous', *Zerman v. Ball,* 735 F.2d 15, 21 (2d Cir.1984), or says a stock is so 'red hot' that the investor 'could not lose,' *Rotstein v. Reynolds & Co.,* 359 F.Supp. 109, 113 (N.D.Ill.1973) (cited with approval in *Zerman,* 735 F.2d at 21), or claims that his primary purpose is to make money for the customer, *Bowman v. Hartig,* 334 F.Supp. 1323, 1328 (S.D.N.Y.1971), the reasonable investor is presumed to understand that this is nothing more than "the common puff of a salesman." *id.,* not a material factual misstatement.

*Newman v. L.F. Rothschild,* 651 F.Supp. 160, 163 (S.D.N.Y.1986) (holding that brokers "I'm the best in the business" statement, among others, is not actionable); *see also Frota v. Prudential–Bache Securities, Inc.,* 639 F.Supp. 1186, 1190 (S.D.N.Y. 1986) (holding that broker's assurances that the account would be properly managed and that he was the investor's

confidant were mere puffery). In a subsequent opinion in the *Newman* litigation, Judge Sweet determined that the "inclusion of a specific percentage ... puts the misrepresentation in a different category from those ..." determined to be puffery in the earlier decision. *Newman v. L.F. Rothschild,* 662 F.Supp. 957, 959 (S.D.N.Y.1987). In so stating, the Court determined that the broker's statement that the investor could earn a return of 20% to 30% without risk was actionable. *Id.* In the present case, plaintiff alleges that James informed her over the telephone that she would receive a very strong cash flow without risk to her initial investment. This statement standing alone approaches the puffery line, but combined with the memorandum sent by defendants promising a return of 13.4% without risk to the investment, the representations are certainly not mere puffery. In addition, and contrary to defendants' argument, the Court does not find that the promise of this return without risk is so unbelievable that an investor could not reasonably rely upon it.

█ Defendants also argue that plaintiff could not reasonably rely on the alleged representation by James that the total amount at risk would be no greater than $8500 since plaintiff signed a promissory note obligating her to pay $54,000 plus 11.2% annual interest on unpaid principal. Defendants point out that this Court recently determined that "[r]eliance on statements which are directly contradicted by the clear language of the offering memorandum through which plaintiffs purchased their securities cannot be a basis for a federal securities fraud claim." *Feinman v. Schulman Berlin & Davis,* 677 F.Supp. 168, 170 (S.D.N.Y.1988). The facts of that case are easily distinguishable. First, plaintiffs in the *Feinman* case did not claim to be unsophisticated investors. Second, they alleged to have relied on factual representations unequivocally contradicted by the clear warnings in the offering memorandum directed to the precise statements upon which they allegedly relied. Third, the complaint in this case states only that plaintiff is alleged to have signed the promissory note at issue. Plaintiff does not

admit signing the note and argues in the alternative that if she did sign the note, the spaces were blank and she did not know what she was signing.[2]

Defendants respond by arguing that Rule 9(b) requires plaintiff to state definitively whether she signed the promissory note, whether it was blank when she signed it and if not, what exactly was filled in. Rule 9(b) requires that

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The particularity requirement exists primarily to protect defendants from frivolous suits. *Feinman, supra,* 677 F.Supp. at 172. Specifically, Rule 9(b) exists to give the defendant in a fraud action "fair notice of what the plaintiffs' claim is and the grounds upon which it rests." *Ross v. A.H. Robins,* 607 F.2d 545, 557 (2d Cir. 1979), *cert. denied* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980) (citations omitted). The key to any Rule 9(b) motion is whether the complaint can apprise the defendant of the alleged conduct with enough detail to enable the defendant to prepare a defense. *See Credit and Finance Corp. Ltd. v. Warner & Swasey Co.,* 638 F.2d 563, 567 (2d Cir.1981) (unartfully drawn complaint stated enough particulars to provide defendants with "fair notice"). Plaintiff has satisfied the Rule 9(b) pleading requirements here. It is clear from the complaint, though not stated in so many words, that plaintiff either did not sign the promissory note or signed it while it was blank, relying on James's statement that no more than $8500 would be at risk. Rule 9(b) does not demand that a plaintiff plead every single fact related to the fraud with exact precision, prior to discovery. *See Federal Savings & Loan Ins. Corp. v. Musacchio,* 695 F.Supp. 1053 (N.D.Cal. 1988) ("Rule 9(b) does not require that the

plaintiff plead matters best left to discovery or trial."); *Frymire v. Peat, Marwick, Mitchell & Co.,* 657 F.Supp. 889, 894 (N.D.Ill.1987) ("Rule 9(b) does not impose a duty of extensive discovery on a plaintiff before that plaintiff has access to discovery."). Instead, the rule requires the plaintiff to supply enough detailed factual allegations to put the defendants on notice. Plaintiff has done so here.

Defendant further contends that plaintiff's allegations that defendants sent her numerous papers in blank, told her to sign them and then return them to defendants is too vague to withstand the strictures of Rule 9(b). The Court agrees that this allegation is vague, but does not believe that Rule 9(b) requires more when the complaint is read as a whole. Plaintiff alleges that she received papers, did not understand them, relied on defendants representations, signed them as instructed by defendants and returned them. Plaintiff no longer has possession of these documents and thus cannot identify them with precision. Although defendants do not know which exact documents plaintiff claims to have signed in blank, defendants will nonetheless be able to prepare their defense. Furthermore, the sending and signing of these papers is not the heart of the alleged fraud, and plaintiff has adequately alleged the time and content of the relevant communications, particularly those in February through April, 1986, such that defendants are adequately put on notice.

Defendants also challenge, on Rule 9(b) grounds, plaintiff's assertion that the investment in CSH-1 was risky. In *Fein v. Shearson Hayden Stone, Inc.,* 461 F.Supp. 137 (S.D.N.Y.1978), upon which defendants rely, the Court ruled that pleading that a certain investment was "perilous", without more, was conclusory since plaintiff did not allege "what these transactions were, much less what rendered them fraudulent or 'perilous'." *Id.* at 143. In the present

---

**2.** Defendants draw the Court's attention to a copy of the promissory note attached to papers previously submitted to the Court. The Court declines to go beyond the pleadings, however, and does not consider the document. To do so

would serve no useful purpose, in any event, since plaintiff has denied signing the document or knowing of its contents. The Court would not be able to resolve this factual dispute at this stage of the litigation.

case, however, plaintiff states that the investment was risky for two reasons. First, she claims she did not believe, based on James's representations, that she would have to invest more than $8500. She later discovered that she was obligated to pay some $85,000 and that a third-party was threatening to liquidate her investment because she was in default. Second, plaintiff alleges that defendants misrepresented the nature of the investment, in order to induce her to invest in CSH-1, by leading her to believe that the investment would not place any of her money at risk of being lost, even though the prospectus, allegedly never shown to plaintiff, described the investment as risky. Defendants certainly should know what plaintiff has accused them of doing, and further elaboration is not necessary at the pleading stage.

## 2. Scienter

■ James also allegedly explained to plaintiff that the investment was suitable for her conservative investment strategy. At the same time, James allegedly failed to inform plaintiff that Prudential, her employer, was a special partner in the limited partnership and was acting as its promoter, a fact that an investor would reasonably want to know. She also failed to explain to plaintiff that the investment was risky, was designed as a tax shelter and that other investments might be more suitable. In this circuit, "the knowing recommendation of an unsuitable security states a cause of

action for fraud under Section 10(b)." *Clark v. Kidder Peabody & Co., Inc.*, 636 F.Supp. 195, 198 (S.D.N.Y.1986); *see also Leone v. Advest, Inc.*, 624 F.Supp. 297, 304 (S.D.N.Y.1985) (plaintiff states unsuitability claim by alleging that broker knowingly or intentionally chose unsuitable investments).[3] Defendant argues that plaintiff has not alleged the scienter necessary to support an unsuitability claim. The Court disagrees. Defendant stresses that plaintiff must allege that defendants "knowingly" recommended or executed unsuitable securities in order to state a claim for relief under section 10(b).[4] This Court recently stated:

> For the purpose of stating a claim and satisfying the requirements of Rule 9(b), plaintiff must supply sufficient facts that give rise to a strong inference that defendant has an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth. *Conn. Natl Bank v. Fluor Corp*, 808 F.2d 957, 962 [2d Cir.1987] (citing *Ross v. A.H. Robins*, 607 F.2d 545, 558 (2d Cir.1979), *cert. denied*, 446 U.S. 946 [, 100 S.Ct. 2175, 64 L.Ed.2d 802] (1980)). Great specificity is not required for allegations of scienter, since Rule 9(b) states that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *Id.* (citing *Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir.1985)).

**3.** Although defendants did not raise the "puffery" argument in the context of an unsuitability claim, the Court notes that an "allegation that a broker 'knew or reasonably believed [certain investments] were unsuitable, but that he recommended them to [plaintiff] anyway' is more than an allegation of 'puffery' and states a violation of Rule 10b-5." *Mauriber v. Shearson/American Express, Inc.*, 567 F.Supp. 1231, 1237 (S.D.N.Y.1983) (citing *Clark, supra*, 583 F.2d at 600).

**4.** The Court disagrees with the statement in *Clark, supra*, that "[r]ecklessness is insufficient scienter for an unsuitability claim," 636 F.Supp. at 198–99, upon which defendants rely. The *Clark* Court based this conclusion on *Clark v. John Lamula Investors, Inc.*, 583 F.2d 594 (2d Cir.1978), in which the Second Circuit affirmed a finding of section 10(b) liability on an unsuitability claim based in part on the District Court's

scienter charge. *Id.* at 600–01. The Court of Appeals found that the jury charge sufficiently explained that plaintiff must prove that defendant intended to deceive plaintiff in making the unsuitable recommendation. *Id.* at 601. The Court noted in a footnote that it had previously held that a finding of recklessness could support the scienter requirement, but did not reach the issue since recklessness was not an issue in the case. *Id.* at 600 n. 7 (citing *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44–7 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978)). In *Rolf*, the Court stated "that reckless conduct satisfies the scienter requirement." 570 F.2d at 46 (citations omitted). The point is somewhat academic in this case, because the Court believes that plaintiff has alleged facts from which the Court can infer a knowing recommendation of an unsuitable investment.

*Wolff Office Equip. Corp. v. Wang Laboratories,* No. 87 Civ. 1498 (SWK), slip op. at 2–3, 1988 WL 143119 (S.D.N.Y. December 30, 1988). Plaintiff has met her burden by alleging that James (1) knew of plaintiff's conservative, risk-free investment goals, (2) lead plaintiff to believe that CSH–1 was an appropriate investment, (3) knew or should have known that CSH–1 was a risky, tax shelter, and (4) knew or should have known that plaintiff did not have the income or assets required for investment in CSH–1. Coupled with the fact that defendant Prudential–Bache was a promotor for CSH–1, and that defendants allegedly forged or altered key documents necessary to the investment, it is possible to infer from the complaint that defendants knowingly suggested and encouraged an unsuitable investment. The Court concludes that plaintiff has adequately alleged scienter.[5]

### B. *Forgeries and Alterations*

■ Defendants attack plaintiff's forgery and alteration allegations on the basis that they cannot state a claim for relief under section 10(b) since plaintiff did not know about their existence or contents and thus could not have relied upon them in making an investment decision. Additionally, defendants argue that these allegations do not allege the requisite device, misrepresentation or omission under section 10(b) or Rule 10b–5. Plaintiff argues that the acts complained of fall within section 10(b)'s prohibition of "any manipulative or deceptive device or contrivance"

and the prohibitions of Rule 10b–5.[6] Plaintiff further argues that reliance is not necessary under these circumstances.

It is true, as defendant argues, that a claim under section 10(b) must allege an element of deception or manipulation, that manipulation is a term of art limited in scope to certain specific practices designed to mislead investors by artificially affecting market activity, and that breaches of fiduciary duty by a corporation do not alone state a claim for relief. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 473–77, 97 S.Ct. 1292, 1300–03, 51 L.Ed.2d 480 (1977). Although plaintiff argues that the activity alleged in the complaint falls within the purview of subsections (a) and (c) of Rule 10b–5, which do not specifically speak of omissions or misrepresentations, the Supreme Court has clarified that the scope of Rule 10b–5 is limited by the statutory requirement of a deceptive or manipulative practice. *Id.* at 473–74, 97 S.Ct. at 1300–01; *see also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 212–14, 96 S.Ct. 1375, 1390–91, 47 L.Ed.2d 668 (1976) (ruling that the scope of Rule 10b–5 cannot exceed the power granted to the S.E.C. by Congress in section 10(b)). Since plaintiff does not allege a "manipulative" practice as the term is defined,[7] plaintiff must allege "deceptive" practices in order to state a claim under section 10(b).

The Court believes that plaintiff has alleged a claim for relief.[8] In *Clark v. Kid-*

---

5. Although defendants' arguments were directed to the unsuitability aspect of plaintiff's claim, it is clear to the Court that plaintiff has also alleged scienter as to the misrepresentation and omission aspects of her claim.

6. Rule 10b–5, often cited but rarely quoted in full, states:
   It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of a national securities exchange,
   (1) to employ any device, scheme or artifice to defraud;
   (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

   (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security, in connection with the purchase or sale of any security.
   17 C.F.R. § 240.10b–5 (1988).

7. The Supreme Court stated that manipulative practices refers to activities such as wash sales, matched orders and price rigging. *Santa Fe Industries, supra,* 430 U.S. at 476, 97 S.Ct. at 1302.

8. The Court reaches this conclusion as an alternative ruling since, even if the forgery and alteration allegations did not state a claim, plaintiff has stated a claim for relief for material misrepresentations and omissions, including an unsuitability allegation, as discussed above.

*der, Peabody, supra,* the Court held that a broker's knowing purchase of an unsuitable security for a discretionary account is actionable under section 10(b), even absent any misrepresentation, since the unsuitable purchase itself is the proscribed act. 636 F.Supp. at 198. Even if the account in the present case were not discretionary, since it appears that consent by plaintiff was necessary prior to investment, the knowing forgery and alteration of documents by defendants has the same effect as the purchase of an unsuitable security in a discretionary account. In both cases, defendants have acted with scienter, a principal requirement, *see id.* (noting that scienter is the chief precondition of liability, not the recommendation), and in both situations the broker is acting on behalf or in the stead of the investor in a fraudulent fashion. Similarly, in *Mauriber v. Shearson/American Express, Inc.,* 567 F.Supp. 1231 (S.D.N.Y. 1983), the Court stated that plaintiff did not need to allege reliance on defendant's deliberate misstatements in a Discretionary Information Statement concerning plaintiff's investment objectives "since these statements were designed not to mislead [plaintiff] but to facilitate [defendant's] fraudulent conduct." 567 F.Supp. at 1236. In the present case, as well, the alleged misstatements in plaintiff's investor questionnaire were designed not to mislead plaintiff but to advance defendants' alleged fraudulent scheme.

The Court also notes, in the context of reliance, that a plaintiff must allege that the act complained of caused the injury in the sense that the alleged section 10(b) violations caused the claimed economic loss. *Manufacturers Hanover Trust v. Drysdale Sec. Corp.,* 801 F.2d 13, 20 (2d Cir.1986) (the necessary "loss causation" is "causation not merely in inducing the plaintiff to enter into a transaction ..., but causation of the actual loss suffered."), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985). In observing that the "loss causation" requirement stems

from notions of "proximate causation" in tort law, the Second Circuit has explained loss causation as requiring "that the damage complained of be one of the foreseeable consequences of the misrepresentation." *Manufacturers Hanover, supra,* 801 F.2d at 20 (citations omitted). The alleged harm here is the amount owing on the promissory note allegedly signed by plaintiff to cover the investment in CSH–1. Plaintiff alleges that investment in CSH–1 would not have been possible if defendants had not misstated plaintiff's assets and income on the relevant forms. The Court concludes that defendants could reasonably have foreseen that an investment of this type for someone in plaintiff's circumstances would naturally lead to the harm for which relief is now sought. Forging the investment forms and misstating the relevant information are the acts which placed plaintiff in the precarious position she has found herself. The Court thus concludes that loss causation has adequately been pleaded.

## II. Section 12(2) Claim

■ Defendant argues that plaintiff's section 12(2) claim is time-barred because plaintiff filed the complaint more than one year after she should reasonably have known of the existence of her cause of action. Section 13 of the 1933 Act provides that

[n]o action shall be maintained to enforce any liability created under ... section 12(2) [15 U.S.C. § 77*l* (2) ] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, ... In no event shall any such action be brought to enforce a liability created ... under section 12(2) ... more than three years after the sale.

15 U.S.C. § 77m. Since plaintiff filed the complaint more than one year and less than three years after the alleged fraudulent acts took place in the spring of 1986,[9] the Court must determine when plaintiff

---

**9.** Plaintiff filed her complaint, and thus com-        menced her action, in May, 1988.

should have, with reasonable diligence, discovered the fraud.

Defendant stresses plaintiff's allegation that she believed her total investment would be $8500, that she was told that this amount had been paid out of her Prudential portfolio, and that in November of 1986 she made a payment of $2,984.25 in relation to CSH–1 after it was demanded of her. Although a jury should in most instances decide when a reasonable investor should have known the essential facts, the Court may dismiss a claim if it is clear as a matter of law that no set of facts could support plaintiff's argument. *Intre Sport Ltd. v. Kidder, Peabody & Co., Inc.,* 625 F.Supp. 1303, 1310–11 (S.D.N.Y.1985) (holding that dismissal is appropriate if further factual development is not necessary to conclusion of law). Compliance with the reasonable diligence standard in the statute requires that plaintiff show she filed suit "when the possibility of suit should have become apparent ...". *Id.* at 1311 (citation omitted).

To the extent plaintiff's section 12(2) claim is premised on the alleged misrepresentation that the total investment would not exceed $8500, the Court concludes that as a matter of law plaintiff should have discovered the fraud with reasonable diligence some time after the demand for payment was made in November, 1986. The Court has previously stated that a "claim under section 12(2) must affirmatively plead compliance with the statute of limitations contained in section 13, and must include a statement of the plaintiff's 'due diligence' in seeking discovery of these untruths or omissions." *Id.* at 1310 (citing *Hill v. Der,* 521 F.Supp. 1370, 1389 (D.Del. 1981)). Whether or not plaintiff must comply strictly with these requirements, it is clear that plaintiff has the burden of demonstrating reasonable diligence. It is also clear that the reasonable care necessary in discovering a fraud relies on an objective standard. *Zola v. Gordon,* 685 F.Supp. 354, 365 (S.D.N.Y.1988) (citing *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983)). The Court believes that the demand for payment in November, 1986 would have piqued the reasonable investor's interest

creating an obligation to be reasonably diligent in discovering the fraud. Plaintiff has not alleged that she took any steps to discover the fraud on or recently after November, 1986.

However, to the extent that plaintiff's section 12(2) claim rests on the recommendation of an unsuitable investment or the forgery and alteration of key documents, as discussed in the sections above, it is clear that plaintiff reasonably did not discover these frauds until or after May, 1987, one year before suit was commenced. Plaintiff was "entitled to rely on [her] confidential relationship with [defendant] to toll the statute of limitations 'until some event [occurs] which would normally awaken suspicion in [her].'" *Zola, supra,* 685 F.Supp. at 365 (citations omitted). Plaintiff did not learn about her default on the promissory note until October, 1987, when Fireman's Insurance contacted her, and she did not learn the true nature of the investment until January, 1988, when the vast majority of relevant documents were first supplied to her. Thus, dismissal of the section 12(2) claim is not warranted.

### III. Section 17(a) Claim

Defendant urges that this claim be dismissed for failure to state a claim on the basis that section 17(a) does not provide a private right of action. In *Kirshner v. United States,* 603 F.2d 234 (2d Cir.1978), *cert. denied,* 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979), the Second Circuit determined that section 17(a) provides a private right of action. *Id.* at 241. Plaintiff argues that this decision remains controlling in this Circuit absent a contrary ruling by the Second Circuit. The Court disagrees.

The Second Circuit has noted that the conclusion reached in *Kirshner* "may be open to reexamination" in light of subsequent Supreme Court decisions reserving judgment on the issue and criticism from commentators. *Yoder, supra,* 751 F.2d at 559 n. 3. This Court has considered the issue in the past and has decided that section 17(a) does not provide a private right

of action. *Beres v. Thomson McKinnon Securities, Inc.,* [1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,395 at 97,072, 1987 WL 16977 (S.D.N.Y.1987). A review of recent decisions in this District reveals that this conclusion reflects the "prevailing winds" on this issue, *Ackerman v. Clinical Data, Inc.,* [1985–86 Binder] Fed.Sec.L. Rep. (CCH) ¶ 92,207 at 91,571, 1985 WL 1884 (S.D.N.Y.1985) (after analyzing issue, Judge Haight held that section 17(a) did not provide private right of action). *See Boley v. Pineloch Associates, Ltd.,* 700 F.Supp. 673, 677–78 (S.D.N.Y.1988) (Walker, J.) (no private right of action); *Deutsch v. Integrated Barter Intl., Inc.,* 700 F.Supp. 194, 201–02 (S.D.N.Y.1988) (Leisure, J.) (same); *Bruce v. Martin,* 691 F.Supp. 716, 725 (S.D.N.Y.1988) (Sweet, J.) (same); *The Limited v. McCrory Corp.,* 683 F.Supp. 387, 395–97 (S.D.N.Y.1988) (Carter, J.) (same); *but see Strong v. Paine Webber, Inc.,* 700 F.Supp. 4, 5–6 (S.D.N.Y.1988) (Griesa, J.) (holding that section 17(a) provides right of action, relying on *Kirshner* ); *Toberoff v. B–J, Inc.,* [1987–88 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,611 at 97,740, 1988 WL 5355 (S.D.N.Y.1988) (Keenan, J.) (same). The Court, having reexamined the *Kirshner* decision, relies on its earlier opinion in *Beres,* and on those mentioned above, in concluding that section 17(a) does not provide a private right of action. This claim is thus dismissed.

### IV. State Law Claims

Defendant moved to dismiss plaintiff's state law claims for lack of pendent jurisdiction. Since the Court has only dismissed the section 17(a) claims, and not the section 10(b) or section 12(2) claims, the state law claims will not be dismissed for lack of pendent jurisdiction. The Court does dismiss plaintiff's Martin Act claim, brought under § 352–c of New York's General Business Law, since the New York Court of Appeals has determined that no private right of action lies thereunder. *CPC Intl., Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 519 N.Y.S.2d 804, 807, 514 N.E.2d 116, 118 (1987).

### CONCLUSION

For the reasons stated above, the Court denies defendants' motion to dismiss plaintiff's section 10(b) and section 12(2) claims, but grants the motion as to plaintiff's section 17(a) claim. Defendants' motion to dismiss the state law claims for lack of pendent jurisdiction is denied, though the Martin Act claim is dismissed since no private right of action exists thereunder.

SO ORDERED.