NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NOS. A-1064-15T1
 A-1093-15T1

OLEG SHTUTMAN,

 Plaintiff-Appellant,

v.

BRIAN PATRICK CARR, Individually
and as a Member of Capital
Markets Advisory Limited
Liability Company f/k/a Carr
Miller Capital Investments, LLC,

 Defendant-Respondent,

and

EVERETT CHARLES FORD MILLER,
Individually and as President
of Carr Miller Capital, LLC,
and as Chief Operating Officer
and Member of Board of Directors
for INDIGO-ENERGY INC.; RYAN
JUDE CARR, Individually and as
a Member of Capital Markets
Advisory Limited Liability
Company f/k/a Carr Miller
Capital Investments, LLC;
HERCULES PAPPAS, Individually and
as an agent of Carr Miller
Capital, LLC, and as Member of
Board of Directors for
INDIGO-ENERGY INC., and as a
principal in ICA Investment
Advisors, LLC; PAPPAS &
RICHARDSON, LLC, a New Jersey
limited liability company;
PAPPAS & WOLF, LLC, a New Jersey
limited liability company; CAPITAL
MARKETS ADVISORY LIMITED LIABILITY
COMPANY, f/k/a CARR MILLER
CAPITAL INVESTMENTS, LLC, a New
Jersey limited liability company;
INDIGO-ENERGY INC.; STEVE DURBIN;
STANLEY L. TEEPLE; BRAD HOFFMAN; and
JOHN FISH,

 Defendants.
_____________________________________

OLEG SHTUTMAN,

 Plaintiff-Respondent,

v.

BRIAN PATRICK CARR, Individually
and as a Member of Capital
Markets Advisory Limited
Liability Company f/k/a Carr
Miller Capital Investments, LLC;

 Defendant-Appellant,

and

EVERETT CHARLES FORD MILLER,
Individually and as President
of Carr Miller Capital, LLC,
and as Chief Operating Officer
and Member of Board of Directors
for INDIGO-ENERGY INC.; RYAN
JUDE CARR, Individually and as
a Member of Capital Markets
Advisory Limited Liability
Company f/k/a Carr Miller
Capital Investments, LLC;
HERCULES PAPPAS, Individually and
as an agent of Carr Miller
Capital, LLC, and as Member of

 2 A-1064-15T1
Board of Directors for
INDIGO-ENERGY INC., and as a
principal in ICA Investment
Advisors, LLC; PAPPAS &
RICHARDSON, LLC, a New Jersey
limited liability company;
PAPPAS & WOLF, LLC, a New Jersey
limited liability company; CAPITAL
MARKETS ADVISORY LIMITED LIABILITY
COMPANY, f/k/a CARR MILLER
CAPITAL INVESTMENTS, LLC, a New
Jersey limited liability company;
INDIGO-ENERGY INC.; STEVE DURBIN;
STANLEY L. TEEPLE; BRAD HOFFMAN; and
JOHN FISH,

 Defendants.
________________________________________________________________

 Submitted May 23, 2017 – Decided October 4, 2017

 Before Judges Leone and Vernoia.

 On appeal from Superior Court of New Jersey,
 Law Division, Burlington County, Docket No.
 L-0638-12.

 Law Offices of Thomas T. Booth, Jr., LLC
 attorneys for Oleg Shtutman, appellant in
 Docket No. A-1064-15 and respondent in Docket
 No. A-1093-15 (Matthew J. Gindele, of counsel
 and on the briefs).

 Brian Patrick Carr, respondent pro se in
 Docket No. A-1064-15 and appellant pro se in
 A-1093-15 (Ernest Edward Badway and Lauren J.
 Talan, on the briefs).

PER CURIAM

 3 A-1064-15T1
 These appeals arise from a Ponzi scheme involving defendant

Everett Charles Ford Miller.1 Plaintiff Oleg Shtutman claimed he

invested over a million dollars in promissory notes (CM notes)

issued by Carr Miller Capital, LLC (CMC) based on representations

about one of CMC's investments, defendant Indigo-Energy, Inc.

Plaintiff sued numerous defendants, claiming common law fraud,

aiding and abetting fraud, negligence, negligent

misrepresentation, and unjust enrichment.

 Prior to trial, all defendants were dismissed except

defendant Brian Patrick Carr.2 On summary judgment, the motion

court dismissed plaintiff's claims of common law fraud, aiding and

abetting fraud, and unjust enrichment but did not dismiss the

negligence and negligent misrepresentation claims.3 The jury found

defendant was negligent and awarded damages.

 Plaintiff and defendant appealed. We listed the appeals

back-to-back and now consolidate them for the purpose of this

opinion. In plaintiff's appeal, Docket No. A-1064-15, we affirm

the motion court's grant of summary judgment on his fraud claim

1
 See United States v. Miller, 833 F.3d 274, 277 (3d Cir. 2016).
2
 Because Brian Patrick Carr was the only defendant remaining
during the trial and on appeal, we will refer to him as
"defendant."
3
 Plaintiff does not challenge the dismissal of the unjust
enrichment claim.

 4 A-1064-15T1
and its imposition of sanctions against him. We reverse the

court's grant of summary judgment on his aiding and abetting fraud

claim. In defendant's appeal, Docket No. A-1093-15, we vacate the

court's denial of summary judgment on plaintiff's negligent

misrepresentation claim, and reverse the denial of summary

judgment on his negligence claim. We reject defendant's challenges

to the trial court's evidentiary rulings except the ruling allowing

testimony regarding a consent order, which was prejudicial error.

We remand for further proceedings on plaintiff's aiding and

abetting fraud claim and his negligent misrepresentation claim

regarding an alleged non-disclosure by defendant.

 I.

 We summarize the facts set forth in the trial testimony.

Plaintiff testified as follows.

 Plaintiff and his wife met Miller when they moved next door

to him in 2006. Miller invited plaintiff and his wife to the CMC

holiday party in 2006. Then and later, plaintiff was told

defendant was "Miller's partner." Defendant told plaintiff "he

was a certified advisor, he was fully licensed in securities."

Plaintiff was impressed with defendant's abilities regarding

"investing and consulting and understanding these investments."

 Plaintiff again met defendant at the 2007 CMC holiday party

at Miller's house. Defendant told plaintiff "how great" Indigo-

 5 A-1064-15T1
Energy was, "how they invested a lot of their own money," and how

"they were going to make the value of it go up, but they needed

initial capital." Defendant "said there was zero risk."

 Miller invited plaintiff to a CMC event at the 2007 Heisman

Trophy dinner. Plaintiff drove there with Miller and defendant,

who discussed how he and Miller were partners. Plaintiff was told

Indigo-Energy was "guaranteed, it's risk free" and "it's ready to

take off." Around eight weeks later, plaintiff made an initial

investment of $100,000 with CMC, and received CM notes as a client

of Miller.

 Miller invited plaintiff and his wife to the 2008 U.S. Open,

where plaintiff next saw defendant. "[A]gain they were just really

high on this Indigo Energy. [Defendant] just couldn't stop talking

about it." Defendant told plaintiff not to "worry about [investing

in] it, we have our own money in it. We have $8 million of Carr

Miller's money into it. . . . [W]e're so well diversified that

you'll never have to worry about losing your investment here."

Plaintiff subsequently invested another $10,000 with CMC.

 Plaintiff next met defendant at the Indigo-Energy

shareholders meeting, at which Miller was chosen as CEO. That

night, at the 2008 Heisman Trophy dinner, Miller and defendant

were talking about "how great this [Indigo-Energy] is going to be,

how the stock is going to skyrocket." Defendant told plaintiff

 6 A-1064-15T1
"there was absolutely no risk." In April 2009, plaintiff made

another investment of $1,000,000 with CMC.

 Plaintiff again saw defendant when he attended the 2009 U.S.

Open at Miller's invitation. "[T]hey always had a reason why the

stock wasn't doing what they said it would be doing" but said

"everything was still going great." Later, plaintiff invested

another $274,900 with CMC.

 Plaintiff testified defendant influenced him the most in

investing with CMC, because defendant "was the brains. He got the

license. He had the education. He had the experience. He had

the look, he had the talk, he had everything you could possibly

ask for." He said he relied "[a] hundred percent" on defendant's

advice in investing.

 Defendant testified as follows. He was licensed as a

certified financial planner until 2010, allowing him "to do

financial planning for individuals, businesses, [and]

organizations." He also had a Series 65 license, allowing him "to

give advice with respect to individual securities."

 Defendant was Chairman of CMC from 2008 to the summer of

2009. There, he served mostly as a figurehead and was not involved

in the day-to-day operations. Defendant never represented to

anyone that he was an owner of CMC. In April 2008, Miller created

a registered investment advisory business, defendant Capital

 7 A-1064-15T1
Markets Advisory Limited Liability Company, originally known as

Carr Miller Capital Investments, LLC (collectively "CMA"). After

the fact, defendant was informed he was given ninety-five percent

ownership of CMA.4

 Defendant has no recollection of meeting plaintiff at the CMC

holiday parties. Defendant did not recall any business being

discussed at the 2007 and 2008 Heisman Trophy Dinner. He only

recalled simply meeting plaintiff at the 2008 Heisman Trophy

dinner. Defendant did not recall seeing plaintiff at the 2008

U.S. Open, remembered plaintiff being present at the 2009 U.S.

Open, but did not recall discussing investments at either event.

Defendant denied any knowledge of plaintiff's investments with

CMC, discussing Indigo-Energy with plaintiff, or selling CMC notes

to plaintiff.

 Miller's deposition testimony was read at trial. In it, he

testified as follows. Miller was the sole owner of CMC; defendant

was never a member. CMC was a separate and distinct entity from

CMA. There was no discussion at the sporting events of plaintiff

investing with CMC. Miller did not believe he ever talked about

investments with plaintiff in defendant's presence, and was

4
 Plaintiff testified no one explained that there was a distinction
between CMC and CMA, and that he believed the entities to be "[o]ne
in the same."

 8 A-1064-15T1
unclear about whether he recalled defendant soliciting plaintiff

to invest with CMC.

 The jury found defendant negligently gave investment advice

to plaintiff, causing him $591,492.00 in damages. On September

30, 2015, the trial court entered a total judgment against

defendant in the amount of $639,814.40, including interest.

 II.

 We first address plaintiff's claims in his appeal (Docket No.

A-1064-15). Plaintiff argues the motion court erred in imposing

sanctions against him and in granting summary judgment on his

common law fraud claim and aiding and abetting fraud claim.

 A.

 The following facts concerning sanctions are taken from the

certification of defendant's counsel, Lauren J. Talan, which the

motion court credited. Defense counsel served a notice to take

plaintiff's deposition on April 15, 2014. Before the deposition

could take place, plaintiff's first counsel withdrew. The motion

court ordered plaintiff to serve his responses to requests for

admissions and his answers to interrogatories by September 22,

2014, and to be deposed by October 31, 2014. However, plaintiff

served his written discovery late.

 As a result, defense counsel initially attempted to schedule

plaintiff's deposition for the beginning of November. Plaintiff's

 9 A-1064-15T1
second counsel responded he was unavailable during the beginning

of November and suggested a December deposition. On October 8,

2014, defense counsel offered to take the deposition on October

29, 30, or 31, 2014. Plaintiff's second counsel did not respond.

Defendant filed a motion for sanctions against plaintiff. After

plaintiff's second counsel filed a response, he was disqualified

and replaced by a third counsel. On March 20, 2015, the motion

court announced it would award a reasonable fee to defendant. On

July 30, 2015, the trial court ordered plaintiff to pay defendant

$5070 in counsel fees plus $89.20 in costs.

 Rule 4:23-2(b) permits various sanctions if "a party fails

to obey an order to provide or permit discovery." In addition,

"the court shall require the party failing to obey the order to

pay the reasonable expenses, including attorney's fees, caused by

the failure," "unless the court finds that the failure was

substantially justified or that other circumstances make an award

of expenses unjust." Ibid.; see Kolczycki v. City of East Orange,

317 N.J. Super. 505, 520 (App. Div. 1999). Plaintiff did not

advance a substantial justification for failing to obey the order

that he submit to deposition before October 31, or failing to

respond to defense counsel's October 8 letter or to make other

arrangements.

 10 A-1064-15T1
 We reject plaintiff's arguments that the sanctions were

unjust. First, he alleges defense counsel made oral

representations which contradicted her certification, but the

court did not appear to rely on those oral representations.

Second, plaintiff notes the sanctions motion was heard four months

after briefing, but he fails to show harm from this delay, caused

by the disqualification of his second counsel. Third, plaintiff

complains his second counsel was not present at the motion hearing

due to his disqualification, but plaintiff's third counsel

reiterated the points made in his second counsel's written

opposition. Fourth, plaintiff claims the court failed to consider

that written opposition, but the record shows the court was aware

of it.

 Plaintiff argues the fees were improperly imposed against

plaintiff directly, not his counsel. However, Rule 4:23-2(b)

authorizes requiring "the party" to pay the fees. We cannot say

the motion court abused its discretion in sanctioning plaintiff.

Thus, the imposition of counsel fees was appropriate under Rule

4:23-2(b).

 B.

 Plaintiff appeals the motion court's August 10, 2015 order

granting summary judgment on the common law fraud claim and the

aiding and abetting fraud claim against defendant.

 11 A-1064-15T1
 Summary judgment must be granted if the court determines

"that there is no genuine issue as to any material fact challenged

and that the moving party is entitled to a judgment or order as a

matter of law." R. 4:46-2(c). The court must "consider whether

the competent evidential materials presented, when viewed in the

light most favorable to the non-moving party in consideration of

the applicable evidentiary standard, are sufficient to permit a

rational factfinder to resolve the alleged disputed issue in favor

of the non-moving party." Brill v. Guardian Life Ins. Co. of Am.,

142 N.J. 520, 540 (1995). An appellate court "review[s] the trial

court's grant of summary judgment de novo under the same standard

as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union

Fire Ins. Co., 224 N.J. 189, 199 (2016). We must hew to that

standard of review, and must "confine ourselves to the original

summary judgment record." Lombardi v. Masso, 207 N.J. 517, 542

(2011).

 1.

 To prove common law fraud, five elements must be satisfied:

"(1) a material misrepresentation of a presently existing or past

fact; (2) knowledge or belief by the defendant of its falsity; (3)

an intention that the other person rely on it; (4) reasonable

reliance thereon by the other person; and (5) resulting damages."

Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997).

 12 A-1064-15T1
 Plaintiff did not present evidence that there was "a material

misrepresentation of a presently existing or past fact." See

ibid. The "plaintiff must show the misrepresentation of a fact

that exists at or before the time the representation is made."

Suarez v. E. Int'l Coll., 428 N.J. Super. 10, 29 (App. Div. 2012).

Fraud claims "cannot ordinarily be predicated on representations

which involve things to be done in the future." Anderson v.

Modica, 4 N.J. 383, 391-92 (1950). "Statements as to future or

contingent events, to expectations or probabilities, or as to what

will or will not be done in the future, do not constitute

misrepresentations, even though they may turn out to be wrong."

Alexander v. CIGNA Corp. 991 F. Supp. 427, 435 (D.N.J. 1997),

aff’d, 172 F.3d 859 (3d Cir. 1998); accord Middlesex Cty. Sewer

Auth. v. Borough of Middlesex, 74 N.J. Super. 591, 605 (Law. Div.

1962), aff'd o.b., 79 N.J. Super. 24-25 (App. Div.), certif.

denied, 40 N.J. 501 (1963)).

 Further, "neither expressions of opinion, nor 'puffery,' will

satisfy this element of fraud." Suarez, supra, 428 N.J. Super.

at 29 (citations omitted). A statement is a matter of fact if it

is "'susceptible of exact knowledge when the statement was made'";

it is a matter of opinion if "'it is unsusceptible of proof'" at

that time. Joseph J. Murphy Realty, Inc. v. Shervan, 159 N.J.

Super. 546, 551 (App. Div. 1978) (citation omitted). "However

 13 A-1064-15T1
persuasive," an opinion that the customer is "in good hands' . . .

is nothing more than puffery," "is not a statement of fact, and

therefore cannot rise to the level of common law fraud." Rodio

v. Smith, 123 N.J. 345, 352 (1991)(citing Joseph J. Murphy Realty,

supra, 159 N.J. Super. at 551). Saying a product is "'the best'

. . . is only a statement of the seller's opinion." Jakubowski

v. Minn. Mining & Mfg., 80 N.J. Super. 184, 195 (App. Div. 1963).

Statements that a house is "'very saleable'" were merely "opinions"

rather than "a material representation of a presently existing or

past fact." Joseph J. Murphy Realty, supra, 159 N.J. Super. at

550-51. Similarly, "fraud cannot be predicated on representations

as to value." Daibo v. Kirsch, 316 N.J. Super. 580, 589 (App.

Div. 1998)(finding the defendan'ts grossly inflated equity

estimate . . . . was not an expression of fact based on [his]

assessment of value").

 Defendant's alleged statements to plaintiff did not speak to

a present or past fact. Plaintiff testified at his deposition

defendant told him the Indigo-Energy "stock is going to increase,"

it was "going to rise," and "it's going to go huge," and how

"terrific everything was going to be." Plaintiff also said he was

told the stocks "c[ould]n't do anything but go up." These

statements all constituted predictions about the future.

Defendant also stated "how great [Indigo-Energy] is currently and

 14 A-1064-15T1
how much greater it's going to be moving forward," and that it was

"undervalued." Those were not statements of fact but related

defendant's opinions, and thus were not actionable. See, e.g.,

Argabright v. Rheem Mfg. Co., 201 F. Supp. 3d 578, 608 (D.N.J.

2016) (Simandle, J.) (finding such statements, including that

products have "'great warranties," are "opinion rather than fact,"

"are neither measurable nor concrete, and are simply too imprecise

to be considered material" under New Jersey law); Amorim Holding

Financeria v. C.P. Baker & Co., 53 F. Supp. 3d 279, 305 (D. Mass.

2014) (finding an assurance that a company is a "'great investment'

. . . is not the type of statement relied upon by reasonable

investors"); Longo v. Butler Equities II, L.P., 718 N.Y.S.2d 30,

31 (App. Div. 2000) (ruling that "the alleged misrepresentations

that the target company was seriously undervalued . . . can only

be understood as nonactionable expressions of opinion, mere

puffing").5

 In his complaint, plaintiff alleged Miller said it was a

"zero risk" investment. In his deposition, he did not claim either

Miller or defendant said it was without risk. However, after

5
 Plaintiff alleged defendant knew Indigo-Energy was not profitable
at the time defendant supposedly encouraged him to invest in it.
However, defendant never told him it was profitable. Rather,
plaintiff testified at his deposition defendant said "that the
stock price is going to increase, and that's where the real profit
and wealth is going to come from."

 15 A-1064-15T1
defendant moved for summary judgment, plaintiff filed a

supplemental certification claiming "I was told by Brian Carr that

investing in CMC was risk free." The motion court discounted

plaintiff's belated "epiphany" in a certification prepared by

counsel.

 Under "the sham affidavit doctrine," trial courts may

"disregard[] an offsetting affidavit that is submitted in

opposition to a motion for summary judgment when the affidavit

contradicts the affiant's prior deposition testimony." Shelcusky

v. Garjulio, 172 N.J. 185, 193-94 (2002). "[A] trial court may

reject an affidavit as a sham when it 'contradict[s] patently and

sharply' earlier deposition testimony, there is no reasonable

explanation offered for the contradiction, and at the time the

deposition testimony was elicited, there was no confusion or lack

of clarity evident from the record." Hinton v. Meyers, 416 N.J.

Super. 141, 150 (App. Div. 2010) (quoting Shelcusky, supra, 172

N.J. at 201-02).

 We need not decide whether plaintiff's "risk free" statement

in his supplemental certification could be disregarded as a sham

affidavit, because the claimed statement was not actionable.

Generally, asserting that an investment has low or no risk is "a

non-actionable vague expression of corporate optimism and puffery

upon which no reasonable investor would rely." Kelly v. Elec.

 16 A-1064-15T1
Arts, Inc., 71 F. Supp. 3d 1061, 1070 (N.D. Cal. 2014); see First

Presbyterian Church v. John G. Kinnard & Co., 881 F. Supp. 441,

444 (D. Minn. 1995); Hasso v. Hapke, 173 Cal. Rptr. 3d 356, 382-

83 (Ct. App. 2014); Paull v. Capital Res. Mgmt., Inc., 987 S.W.2d

214, 218-19 (Tex. App. 1999); Loula v. Snap-On Tools Corp., 498

N.W.2d 866, 868-69 (Wis. Ct. App. 1993).6

 Here, even drawing all inferences in favor of plaintiff,

defendant's alleged statement that the investment was risk free

was not actionable. According to plaintiff, defendant was urging

him to invest because Indigo-Energy, a gas-drilling company which

had not yet struck gas, would be successful in the future. In

that context, if defendant claimed the investment was risk free,

"no rational person would accept such a claim." See Suarez, supra,

428 N.J. Super. at 35 (quoting Trs. of Columbia Univ. v. Jacobsen,

53 N.J. Super. 574, 579 (App. Div.), appeal dismissed, 31 N.J.

221-22 (1959), cert. denied, 363 U.S. 808, 80 S. Ct. 1243, 4 L.

Ed. 2d 1150 (1960)). Such opinions about the risk of future loss

6
 Cf. Cohen v. Prudential-Bache Secur., Inc., 713 F. Supp. 653,
658 (S.D.N.Y. 1989) (finding a statement an investment was "without
risk" "approaches the puffery line" but finding it actionable when
combined with an assurance of a precise rate of return); Webb v.
First of Mich. Corp., 491 N.W.2d 851, 853-54 (Mich. Ct. App. 1992)
(finding a statement that an investment was "risk-free" "has the
appearance of a mere expression of professional opinion or of
'puffing,' neither of which would be actionable," but denying
summary judgment by "[g]iving the benefit of doubt to plaintiffs").

 17 A-1064-15T1
"are merely expressions in the nature of puffery and thus are not

actionable." See N.J. Citizen Action v. Schering-Plough Corp.,

367 N.J. Super. 8, 13-14 (App. Div.)(finding non-actionable a

statement that a customer "'can lead a normal nearly symptom-free

life again'"), certif. denied, 178 N.J. 249 (2003).

 Plaintiff also argues defendant committed a negligent

misrepresentation by failing to tell him that the CMC notes he was

purchasing were unregistered, non-exempt securities, which he

claims could not be sold under New Jersey law. See N.J.S.A. 49:3-

60. This claim requires different treatment.

 In his complaint, plaintiff's negligent misrepresentation

count alleged that "[d]efendants . . . omitted material facts to

Plaintiff in connection with the offer and sale of securities,"

but did not list among the omitted facts that the securities were

unregistered and non-exempt.7 When asked at his deposition if he

had "any communications with Brian Carr or anyone at CMA regarding

your [CMC] notes," plaintiff answered that defendant "was aware"

that plaintiff "had an investment there," and that they discussed

7
 Plaintiff's complaint did not allege that defendant committed
fraud by non-disclosure. However, "our rules demand [fraud] be
pleaded with specificity." Nostrame v. Santiago, 213 N.J. 109,
129 (2013) (citing R. 4:5-8(a)); see Miller v. Bank of America
Home Loan Servicing, L.P., 439 N.J. Super. 540, 552 (App. Div.
2015) (a plaintiff must plead that the defendant knowingly
concealed a material fact). Therefore, we decline to read such
an allegation into plaintiff's fraud count.

 18 A-1064-15T1
"how it was doing and how it was progressing and how it was to

progress moving forward." Plaintiff gave no deposition testimony

that he was deceived concerning the unregistered and non-exempt

nature of the securities.

 However, in his supplemental certification filed in

opposition to summary judgment, plaintiff averred:

 I was never advised by Brian Carr that the CMC
 Notes were considered non-exempt unregistered
 securities and violated . . . New Jersey law.
 Brian Carr never advised me that he was not
 authorized to sell those securities. I would
 not have invested in CMC had I known that the
 Notes were essential[ly] illegal securities.

Although the court found plaintiff's supplemental certification

was a sham affidavit insofar as it asserted defendant said

investing in CMC was "risk free," the court did not rule on whether

it was a sham regarding the non-disclosure averment.

 Plaintiff argued to the motion court this non-disclosure was

a misrepresentation. The court correctly noted it was not

defendant but CMC which sold the CMC notes to plaintiff. But the

court did not address the averment defendant failed to disclose

the CMC notes were unregistered and non-exempt.

 The sham affidavit issue should be resolved by the trial

court in the first instance, applying the standards set forth in

Shelcusky and Hinton. If the court finds plaintiff's non-

disclosure averment was a sham, the court shall dismiss the

 19 A-1064-15T1
negligent misrepresentation claim. Otherwise, the court should

address whether summary judgment is otherwise appropriate on the

non-disclosure averment. We vacate the denial of summary judgment

on the non-disclosure issue, and remand for further proceedings.

Because plaintiff failed to advance sufficient evidence of a

"material misrepresentation of a presently existing or past fact,"

Gennari, supra, 148 N.J. at 610, we affirm the dismissal of the

fraud claim against defendant.8

 2.

 Plaintiff also appeals the dismissal of his claim for aiding

and abetting fraud. To prove such a claim,

 a plaintiff must show that "(1) the party whom
 the defendant aids must perform a wrongful act
 that causes an injury; (2) the defendant must
 be generally aware of his role as part of an
 overall illegal or tortious activity at the
 time that he provides the assistance; (3) the
 defendant must knowingly and substantially
 assist the principal violation."

 [State, Dep't of Treasury ex rel. McCormac v.
 Qwest Commc'ns Int'l, Inc., 387 N.J. Super.
 469, 484-85 (App. Div. 2006) (quoting Tarr v.
 Ciasulli, 181 N.J. 70, 84 (2004)).]

 "A claim for aiding and abetting fraud [thus] requires proof

of the underlying tort, that is, the fraud committed by [the

8
 Accordingly, we need not consider whether the evidence supported
a reasonable inference defendant knew his statements were false.

 20 A-1064-15T1
principal]." Id. at 485. Accordingly, plaintiff had to present

proof Miller defrauded plaintiff.

 The motion court granted summary judgment on the sole ground

that Miller was no longer a party to the case.9 The court viewed

Miller's dismissal as meaning "the issue of Mr. Miller's fraud is

never going to go to the jury in this case." The court ruled that

"without the finding of Miller's fraud," a jury could not find

defendant aided and abetted Miller's fraud.

 However, the jury could have been instructed to determine if

Miller defrauded plaintiff even if Miller was longer a party. Even

in a criminal case, a defendant can be convicted of aiding and

abetting a principal even if the principal was not prosecuted or

was acquitted. N.J.S.A. 2C:2-6(f); State v. Parris, 175 N.J.

Super. 603, 606-08 (App. Div. 1980) (applying the common law). We

see no reason why the same could not occur in this civil case

where the principal was not sued, has settled, or was dismissed.

If the jury found Miller defrauded plaintiff, and that defendant

aided and abetted Miller it would be appropriate to hold defendant

liable for his aiding and abetting even if the case could not be

pursued against Miller.

9
 A stipulation of dismissal had been filed as to Miller and CMC,
allegedly because a receiver had been appointed.

 21 A-1064-15T1
 As the only ground offered by the motion court was invalid,

we reverse its order granting summary judgment on the aiding and

abetting claim, and remand for further proceedings on that claim.

If the claim proceeds to trial, the court shall instruct the jury

to make findings about whether Miller defrauded plaintiff, and the

other elements of aiding and abetting against defendant.

 III.

 We now address defendant's claims in his appeal (Docket No.

A-1093-15). He appeals the motion court's August 10, 2015 order

denying summary judgment on plaintiff's negligence claim and

negligent misrepresentation claim. He also claims the trial court

made several erroneous evidentiary rulings.

 A.

 Regarding the negligence-based claims, defendant first argues

the motion court erred in finding he had a duty to plaintiff. "A

prerequisite to recovery on a negligence theory is a duty owed by

defendant to plaintiff. . . . [T]he question of whether a duty

exists is a matter of law properly decided by the court, not the

jury." Strachan v. John F. Kennedy Memorial Hosp., 109 N.J. 523,

529 (1988) (citations omitted).

 "In New Jersey, professionals are held to the standards of

their industry," and "investment advisors are professionals who

hold themselves out to the public as having special knowledge,

 22 A-1064-15T1
labor or skill." Lucier v. Williams, 366 N.J. Super. 485, 496

(App. Div. 2004) (citing Erlich v. First Nat'l Bank, 208 N.J.

Super. 264, 287-88 (Law Div. 1984)). A professional investment

advisor has a duty "to give prudent advice." Erlich, supra, 208

N.J. at 291; see also Harvey E. Bines & Steve Thel, Investment

Management Law and Regulation § 6.01 at 289 (2004) ("Investment

managers owe their clients professional competence in the handling

of client affairs.").

 As the account representative for plaintiff at CMC, Miller

had a duty to act as a reasonable investment advisor. Defendant,

an investment advisor himself, served as Chairman of CMC from 2008

to the summer of 2009. Plaintiff certified he was "always

introduced to Brian Carr as Everett Miller's partner and . . .

heard Brian Carr introduced to others in that capacity." Thus,

as the motion court found, there was sufficient evidence, viewed

in the light most favorable to plaintiff, for a jury to find

defendant held himself out as a representative of CMC.

 Under those circumstances, the motion court properly ruled

that Miller had an obligation "not to provide erroneous, misleading

information," and that if defendant was acting "on behalf of CMC

then he had the same obligation to [plaintiff]."

 Whether a person owes a duty of reasonable
 care toward another turns on whether the
 imposition of such a duty satisfies an abiding

 23 A-1064-15T1
 sense of basic fairness under all of the
 circumstances in light of considerations of
 public policy. That inquiry involves
 identifying, weighing, and balancing several
 factors – the relationship of the parties, the
 nature of the attendant risk, the opportunity
 and ability to exercise care, and the public
 interest in the proposed solution.

 [Hopkins v. Fox & Lazo Realtors, 132 N.J. 426,
 439 (1993).]

 Our Supreme Court has applied those principles to analogous

situations. See, e.g., Carter Lincoln-Mercury, Inc., Leasing Div.

v. EMAR Grp., Inc., 135 N.J. 182, 194 (1994); see also Banco

Popular N. Am. v. Gandi, 184 N.J. 161, 179 (2005) (discussing

Petrillo v. Bachenberg, 139 N.J. 472 (1995)). "One who holds

himself out to the public as [a professional] is required to have

the degree of skill and knowledge requisite to the calling," and

to exercise it. Carter Lincoln-Mercury, supra, 135 N.J. at 189

(quoting Rider v. Lynch, 42 N.J. 465, 476 (1964)) (both holding

an insurance broker is liable to a non-client). The professional's

"duty is defined not by the contractual relationship between the

parties but by considerations of foreseeability and fairness."

Id. at 196.

 Moreover, our Supreme Court has relied on the Restatement's

negligent misrepresentation section, Restatement (Second) of

Torts, §522 (1977). Banco Popular, supra, 184 N.J. at 180;

Petrillo, supra, 139 N.J. at 484. Section 552 imposes on

 24 A-1064-15T1
professionals and other business people a duty to avoid negligently

providing false information, including to non-clients:

 (1) One who, in the course of his business,
 profession or employment, or in any other
 transaction in which he has a pecuniary
 interest, supplies false information for the
 guidance of others in their business
 transactions, is subject to liability for
 pecuniary loss caused to them by their
 justifiable reliance upon the information, if
 he fails to exercise reasonable care or
 competence in obtaining or communicating the
 information.

 (2) . . . [T]he liability stated in Subsection
 (1) is limited to loss suffered

 (a) by the person or one of a
 limited group of persons for whose
 benefit and guidance he intends to
 supply the information or knows that
 the recipient intends to supply it;
 and

 (b) through reliance upon it in a
 transaction that he intends the
 information to influence or knows
 that the recipient so intends or in
 a substantially similar
 transaction.

 [Restatement, supra, § 552.]

 Applying § 552, our Supreme Court in H. Rosenblum, Inc. v.

Adler, 93 N.J. 324 (1983), determined that non-client investors

"could maintain a negligence action against a certified public

accountant who negligently had prepared financial statements" on

which "investors foreseeably may rely." Petrillo, supra, 139 N.J.

 25 A-1064-15T1
at 484; see H. Rosenblum, supra, 93 N.J. at 352.10 In Petrillo,

supra, the Court ruled that, "like certified public accountants

or other professionals involved in commercial transactions, a

lawyer's duty may run to [non-client] third parties who foreseeably

rely on the lawyer's opinion[.]" 139 N.J. at 484.

 We see no reason why the same duty could not be imposed on

defendant, an investment advisor, if he was holding himself out

to plaintiff as a representative of CMC. See Singer v. Beach

Trading Co., 379 N.J. Super. 63, 76-77 (App. Div. 2005) (applying

§ 552 to a company responding to an employment inquiry). If

defendant was holding himself out to plaintiff as a representative

of CMC, he was holding himself out as acting "in the course of his

business, profession or employment, or in any other transaction

in which he has a pecuniary interest." Restatement, supra, §

552(1); see id. § 552 cmt. d ("[O]fficers of a corporation,

although they receive no personal consideration for giving

information concerning its affairs, may have a pecuniary interest

10
 Subsequent legislation modified the standard for accountants,
N.J.S.A. 2A:53A-25, but did "not affect the application of section
552 to other professionals." Petrillo, supra, 139 N.J. at 485.

 26 A-1064-15T1
in its transactions, since they stand to profit indirectly from

them").11

 If a jury found that defendant held himself out to plaintiff

as a representative of CMC, imposing a duty on defendant toward

plaintiff "satisfies an abiding sense of basic fairness." Hopkins,

supra, 132 N.J. at 439. It also conforms to the interpretation

of § 552 in H. Rosenblum, Petrillo, and Singer. Therefore, the

motion court did not err in finding there was evidence supporting

plaintiff's claim that defendant owed him a duty sufficient to

support his negligence claims.12

 Second, defendant argues that even if the motion court

properly found a duty, it erred in denying summary judgment on

plaintiff's negligence and negligent misrepresentation claims. We

are constrained to agree concerning the alleged

11
 By contrast, if defendant was not holding himself out to
plaintiff as a representative of CMC, he would not have a duty to
plaintiff, as there is no claim plaintiff otherwise engaged him
as an investment advisor. If a professional or business person
"gives a casual and offhand opinion . . . to a friend whom he
meets on the street, or what is commonly called a 'curbstone
opinion,' it is not to be regarded as given in the course of his
business or profession." Restatement, supra, § 552 cmt. d.
12
 We note the trial court's instructions and the jury verdict
sheet did not require the jury to resolve the disputed factual
issue of whether defendant held himself out to plaintiff as a
representative of CMC.

 27 A-1064-15T1
misrepresentations, because they are puffery, prediction, or

opinion.

 Negligence has four elements: "'(1) [a] duty of care, (2) [a]

breach of [that] duty, (3) proximate cause, and (4) actual

damages[.]'" Polzo v. Cty. of Essex, 196 N.J. 569, 584 (2008)

(citations omitted) (alterations in original). Where the

negligence involves misrepresentation, "[a]n incorrect statement,

negligently made and justifiably relied upon, may be the basis for

recovery of damages for economic loss or injury sustained as a

consequence of that reliance." H. Rosenblum, supra, 93 N.J. at

334; accord Green v. Morgan Props., 215 N.J. 431, 457 (2013); see

Restatement, supra, § 552.

 "The element of reliance is the same for fraud and negligent

misrepresentation." Kaufman v. I-Stat Corp., 165 N.J. 94, 109

(2000) (citing H. Rosenblum, supra, 93 N.J. at 334; Gennari, supra,

148 N.J. at 610). Such reliance must be justifiable. Ibid.

Similarly, "[i]ncorrect statement and misstatement of fact are

elements of both common law fraud and negligent

misrepresentation." Union Ink Co. v. AT&T Corp., 352 N.J. Super.

617, 645 (App. Div. 2002). If a defendant cannot be held liable

for a statement made with an intent to defraud that is puffery,

opinion, or prediction, there is no reason he should be liable for

the same statement if made honestly but negligently.

 28 A-1064-15T1
 Thus, "[i]n order to sustain a cause of action based on

negligent misrepresentation, the plaintiff must establish that the

defendant negligently made an incorrect statement of a past or

existing fact." Masone v. Levine, 382 N.J. Super. 181, 187 (App.

Div. 2005).13 "Reliance is ordinarily not justifiable if the

misrepresentation . . . is mere puffing, or states an opinion or

judgment of one without specialized knowledge and that does not

imply assertions of fact; [or] predicts some future course of

events over which the defendant has little or no control[.]" D.

Dobbs et al., 3 The Law of Torts, § 672 at 669, §676 at 682 (2d

ed. 2011); see W. Keeton et al., Prosser and Keeton on the Law of

Torts, § 109 (5th ed. 1984).

 As set forth in our discussion of the fraud claim, plaintiff

presented no evidence that defendant made an incorrect statement

of a past or existing fact. Instead, defendant's alleged

13
 Courts have similarly held under § 552 of the Restatement that
"[a] claim for negligent misrepresentation cannot be based on
future promises; it must be premised on statements about past or
present facts." In re Allstate Life Ins. Co. Litig., 971 F. Supp.
2d 930, 945 (D. Ariz. 2013); see Morrow v. Bank of Am., N.A., 324
P.3d 1167, 1180 (Mont. 2014); Wilkinson v. Shoney's, Inc., 4 P.3d
1149, 1165 (Kan. 2000) (rejecting a negligent misrepresentation
claim based on "a personal opinion {rather] than a representation
of past or present fact"); see also Alpine Bank v. Hubbell, 555
F.3d 1097, 1106 (10th Cir. 2009) (finding a statement "cannot
trigger liability because it amounts to mere puffery").

 29 A-1064-15T1
statements were mere puffery, predictions, or opinions, which

generally are not actionable. See id. §§ 676-78.

 Our Supreme Court has held that in certain circumstances,

"'[t]he statement need not be a factual report, but may consist

of an expert opinion.'" H. Rosenblum, supra, 93 N.J. at 334

(citation omitted). Thus, the Court in H. Rosenblum held

accountants issuing an audit report "should be responsible for

their careless misrepresentations to [third] parties who

justifiably relied upon their expert opinions" that a company's

"financials had been prepared in accordance with generally

accepted accounting principles and fairly presented [its]

financial condition." Id. at 355-56. In Petrillo, supra, the

Court held an attorney could be liable for misrepresentations in

an opinion letter to "third parties who foreseeably rely on the

attorney's opinion." 139 N.J. at 485. "The purpose of a legal

opinion letter is to induce reliance by others." Banco Popular,

supra, 184 N.J. at 183 (quoting Petrillo, supra, 139 N.J. at 482).

 Defendant's vague oral opinions offered at sporting and

social events did not fall within the special duties created by

H. Rosenblum and Petrillo for written audit reports and opinion

letters expressing formal expert opinions. See The Law of Torts,

supra, § 667 at 653 & n.7 (distinguishing experts such as lawyers

and accountants retained to provide accurate information); see

 30 A-1064-15T1
also id. § 725 at 40 & n.19 (citing Petrillo, supra, 139 N.J. at

655). Instead, they fall within the general rule that "statements

that are merely opinion . . . or predictions of the future, do not

qualify as representations of fact" and are inadequate to justify

reliance. The Law of Torts, supra, § 675 at 682. "The securities

dealer who tells a client that a stock is bound to rise in the

next year is not asserting a fact but predicting the future." Id.

at 683. Such statements about stocks are "a classic case of

puffing by predicting the future, for which, subject to exceptions,

liability should be rejected." The Law of Torts, supra, § 678 at

689. Accordingly, we reverse the motion court's denial of summary

judgment on plaintiff's negligence claim, and on his negligent

misrepresentation claim to the extent it is based on the same

alleged misrepresentations. Because the court should have granted

summary judgment on the only counts on which plaintiff prevailed

at trial, we must reverse the jury's verdict as well.

 B.

 Defendant argues the trial court committed four evidentiary

errors. "Considerable latitude is afforded a trial court in

determining whether to admit evidence, and that determination will

be reversed only if it constitutes an abuse of discretion." State

v. Feaster, 156 N.J. 1, 82 (1998). "Under that standard, an

appellate court should not substitute its own judgment for that

 31 A-1064-15T1
of the trial court, unless 'the trial court's ruling "was so wide

of the mark that a manifest denial of justice resulted."'" State

v. Kuropchak, 221 N.J. 368, 385 (2015) (citations omitted).

 1.

 First, defendant argues the trial court erred in allowing the

jury to hear evidence regarding the "Consent Order and Final

Judgment" entered against defendant and CMA in a separate civil

action by the Attorney General on behalf of the Chief of the Bureau

of Securities. Chiesa ex rel. Tiger v. Miller, et al., Docket No.

ESX-C-288-10 (May 7, 2012). The Consent Order reported the Chief's

"findings of fact and conclusions of law," and stated defendant

and CMA would "neither admit nor deny" them.

 While the Consent Order was not admitted into evidence,

plaintiff's counsel questioned defendant about it. Counsel read

aloud before the jury several paragraphs of the consent order,

including that defendant "misrepresented and omitted material

information regarding . . . how investors' funds would be used,

the true nature and risk of investing in the Carr Miller Notes,

the financial condition of Carr Miller Capital, [and] the nature

and outcome of past investments made by Carr Miller Capital";

defendant "presented certain investors with false information

regarding certain purported Carr Miller Capital investments,

including Indigo Energy Inc."; and defendant "told certain

 32 A-1064-15T1
investors . . . that their investments were risk-free." Defendant

answered that under the Consent Order, he neither "admitted or

denied" those statements, and that he denied them all as to

plaintiff, who was not a party to the Consent Order. Plaintiff's

counsel stressed to defendant "this was a consent order that your

attorney signed and you entered into."

 Defendant moved in limine to bar evidence concerning the

Consent Order as irrelevant and inadmissible under N.J.R.E. 403

and 404(b). The trial court stated it permitted the discussion

of the Consent Order before the jury because "what [defendant]

neither admitted or denied are allegations that are somewhat

consistent with what [plaintiff] said he was told by" defendant,

plaintiff was entitled to admit that "context," and "a jury can

infer that [defendant's] sales technique [was] going to be the

same for every potential customer," including plaintiff. The

court's ruling was an abuse of discretion.

 First, the testimony regarding the Consent Order was not

relevant under N.J.R.E. 402. The premise of the Consent Order was

that "Brian Carr and CMA neither admit nor deny" the Chief's

findings and conclusions. Thus, the "findings" in the Consent

Order were simply allegations by the Chief, neither admitted by

defendant nor established in an adversarial judicial or

administrative hearing. Such allegations are not themselves

 33 A-1064-15T1
relevant facts. See, e.g., State v. K.S., 220 N.J. 190, 193 (2015)

(holding that, absent an admission or proof of guilt, prior

dismissed charges cannot be used to create "an impermissible

inference of guilt").

 Settlements of suits are "'not factually relevant [if] they

do not imply a belief (and, consequently, an admission by

implication) on the part of the offeror that the adversary's claim

is well founded, but rather that the further prosecution of the

claim is preferably avoided by a purchase of the offeror's peace.'"

Wyatt v. Wyatt, 217 N.J. Super. 580, 586 (App. Div. 1987) (citation

omitted); see 4 Wigmore on Evidence § 1061 at 36 (Chadbourn rev.

1972). Indeed, as defendant argues on appeal, settlements are

inadmissible to prove liability, in part because they are

irrelevant. N.J.R.E. 408; see Biunno, Weissbard & Zegas, Current

N.J. Rules of Evidence, comment 1 on N.J.R.E. 408 (2017).

 Moreover, the "findings" in defendant's Consent Order with

the State focused on defendant's dealings with the clients of CMA,

and did not purport to address defendant's dealings with plaintiff,

who was unmentioned. "A settlement of compromise made by the

defendant with other parties having similar claims would seem to

be inadmissible [and irrelevant] on the additional ground that the

reasons for admitting another person's claim might not be the same

 34 A-1064-15T1
as those affecting the present claim[.]" 4 Wigmore, supra, § 1061

at 47.

 Because the Chief's "findings" related to defendant's actions

regarding other persons, they constituted "evidence of other

crimes, wrongs, or acts," which generally "is not admissible to

prove the disposition of a person in order to show that such person

acted in conformity therewith." N.J.R.E. 404(b). Plaintiff argues

N.J.R.E. 404 is irrelevant because the "findings" were

"inextricably related" to his complaint. However, they did not

"'directly prove[] the charged [torts]'" or "'facilitate the

commission of the charged [torts]'" against plaintiff, and so they

"'must be analyzed under Rule 404(b).'" State v. Rose, 206 N.J.

141, 179-81 (2011) (citation omitted).

 Under N.J.R.E. 404(b), the evidence had to meet "the standards

for admissibility articulated by our Supreme Court in State v.

Cofield, 127 N.J. 328, 338 (1992), which are also applicable in

civil cases." N.J. Div. of Youth & Family Servs. v. H.B., 375

N.J. Super. 148, 181 (App. Div. 2005).

 1. The evidence of the other crime must be
 admissible as relevant to a material issue;

 2. It must be similar in kind and reasonably
 close in time to the offense charged;

 3. The evidence of the other crime must be
 clear and convincing; and

 35 A-1064-15T1
 4. The probative value of the evidence must
 not be outweighed by its apparent prejudice.

 [State v. Skinner, 218 N.J. 496, 514-15 (2014)
 (quoting Cofield, supra, 127 N.J. at 338).]

 The "findings" in the Consent Order were not supported by

clear and convincing evidence because they were only allegations

defendant did not admit. For the same reason, they were not

relevant to a material issue. They were not shown to be

"admissible to prove something other than an individual's

propensity to commit wrongful acts." State v. Weaver, 219 N.J.

131, 150 (2014).

 The trial court stated the "findings" provided "context."

However, a party seeking to admit background evidence generally

must "'identify the specific, non-propensity purpose for which he

seeks to introduce it.'" Rose, supra, 206 N.J. at 181 (citation

omitted). The court stated the "findings" showed defendant's

"sales technique," but neither the court nor plaintiff identified

what non-propensity purpose that served.

 In any event, the trial court failed to consider the standards

of Cofield, supra, including its fourth prong that "[t]he probative

value of the evidence must not be outweighed by its apparent

prejudice." 127 N.J. at 338; see N.J.R.E. 403. It was highly

prejudicial to read the "findings" before the jury, with reminders

that defendant entered into and his counsel signed the Consent

 36 A-1064-15T1
Order. The "findings" stated defendant misrepresented multiple

facts to numerous other investors about CMC, the CM notes, and

Indigo-Energy. However, the "findings" had no probative value

because they were allegations defendant never admitted. Any

probative value was "'so greatly outweighed by the prejudicial

effect -- namely, the jury's inevitable assumption that defendant

has a propensity to engage in such conduct -- as to render it

inadmissible.'" State v. J.M., 225 N.J. 146, 161 (2016) (citation

omitted).

 Such "other-crimes evidence has a 'unique tendency' to

prejudice a jury against the defendant[.]" State v. Gillispie,

208 N.J. 59, 85 (2011) (citation omitted). Further, plaintiff's

closing arguments stressed the Consent Order. Plaintiff detailed

the "findings of fact," which defendant "neither admitted or

denied, whatever that means," and concluded: "He can't run away

from what he admitted to, or what he neither admitted nor denied

in a consent order that he entered in a prior case."

 The prejudice "was compounded by the failure of the judge to

issue the careful limiting instruction that Cofield and Rose

require." State v. Jones, 425 N.J. Super. 258, 275 (App. Div.

2012) (citations omitted). "[L]imiting instructions must be

provided to inform the jury of the purposes for which it may, and

for which it may not, consider the evidence of defendant's

 37 A-1064-15T1
uncharged misconduct, both when the evidence is first presented

and again as part of the final jury charge." Rose, supra, 206

N.J. at 161. No such instructions were given here. When a juror

said "[t]here was a lot of discussion" about the Consent Order,

and asked its nature and purpose, the court merely told the jurors

that it was a "consent order from a court" which defendant "neither

admitted or denied," and that they could consider the discussion

about the "findings".

 "When a trial court fails to employ the Cofield test to

analyze the admissibility of other-crimes evidence, 'no deference

is to be accorded the trial court's decision to admit that

evidence; nor is that decision entitled to be reviewed under an

abuse of discretion standard'"; instead, appellate courts

"undertake a plenary review of whether the other-crimes evidence

was admissible." State v. Reddish, 181 N.J. 553, 609 (2004)

(citation omitted). We conclude that the Consent Order evidence

was inadmissible, and that its admission had the "clear capacity

of producing an unjust result." R. 2:10-2. Therefore, we reverse

the jury's verdict and remand for a new trial.14

14
 Plaintiff disclaims reliance on N.J.R.E. 406, so we need not
consider defendant's argument that the evidence was also
inadmissible under that rule.

 38 A-1064-15T1
 2.

 We address the remaining evidentiary issues, which may arise

during the retrial. Defendant argues the trial court erred in

permitting testimony from Michael P. Pompeo, the receiver for

Miller and CMC appointed in the Miller action brought by the

Attorney General. Defendant argues Pompeo's testimony was

inadmissible under N.J.R.E. 602 because Pompeo had no "personal

knowledge" of the events that transpired.15

 However, as receiver in the Miller action, Pompeo was charged

with reviewing the books and records of and pertaining to Miller

and CMC. That review also caused Pompeo to learn facts concerning

defendant and CMA.16 Plaintiff called Pompeo to testify concerning

the facts he uncovered.

 The trial court allowed Pompeo to testify, "analogiz[ing]

[him] to the Court's expert." However, the court did not permit

Pompeo to testify that he was appointed as a receiver. Pompeo was

15
 N.J.R.E. 602 provides:

 [A] witness may not testify to a matter unless
 evidence is introduced sufficient to support
 a finding that the witness has personal
 knowledge of the matter. Evidence to prove
 personal knowledge, may, but need not, consist
 of the testimony of that witness.
16
 The receiver entered into a confidential settlement agreement
with defendant and CMA, requiring them to pay restitution,
disgorgement, and a civil monetary penalty.

 39 A-1064-15T1
instructed to "talk about what [he] found," but not to speak about

"findings of guilt" or "finding[s] of violations."

 Pompeo informed the jury he was retained to investigate CMC.

He testified as follows. CMC "raised money from individual

investors through the sale and issuance of nine-month promissory

notes." The notes were required to be registered with the New

Jersey Bureau of Securities, but were not, and thus were illegally

sold. Indigo-Energy "was never a profitable company." "There was

substantial doubt concerning Indigo Energy's viability" from the

time CMC began investing in it.

 Pompeo testified CMC was a Ponzi scheme, "when a company

raises funds from an investor and uses those funds to pay back old

investors." CMC raised $41 million with only $11.7 million

returned to investors. Plaintiff invested $1,584,900 with CMC,

but received only $401,954 from CMC.

 Pompeo testified "the principal of Carr Miller Capital,

Everett Miller, used Carr Miller Capital and its funds

indistinguishable from his own." CMC paid commissions to

defendant, and rent to CMA, and defendant received $200,206 more

from CMC than he contributed to CMC.

 Pompeo had sufficient personal knowledge of the facts about

which he testified. His investigation into CMC gave him personal

knowledge of its finances and the financial information about the

 40 A-1064-15T1
Ponzi scheme. See United States v. Christie, 624 F.3d 558, 568

(3d Cir. 2010) (holding a lead investigator's "responsibilities

gave him sufficient information to testify about various aspects

of the investigation" under Fed. R. Evid. 602, "even if he did not

conduct each step himself"). Because that financial information

was recorded in business records, it was not necessary for Pompeo

to be personally involved during the Ponzi scheme. See United

States v. Weaver, 281 F.3d 228, 231 (D.C. Cir. 2002) (holding an

active participant in an investigation may testify under Fed. R.

Evid. 602 about "personal knowledge he gained during the course

of his examination" of business records); see also 3-602

Weinstein's Federal Evidence § 602.02[3] (2017). The facts he

testified to were relevant to plaintiff's action against

defendant, and were helpful to the jury.

 Defendant argues Pompeo's testimony violated the best

evidence rule, as defendant could have provided some of the same

information provided by Pompeo. However, "a witness who has

personal knowledge of the matter about which he is asked to testify

should not be precluded from testifying merely because another

potential witness might be in a better position to testify about

that matter." Biunno, Weissbard & Zegas, N.J. Rules of Evidence,

comment on N.J.R.E. 602 (2017) (citing Gunter v. Fischer Sci. Am.,

 41 A-1064-15T1
193 N.J. Super. 688, 693 (App. Div. 1984)). Therefore, it was not

an abuse of discretion to admit Pompeo's testimony.17

 Plaintiff also argues the trial court erred in restricting

testimony concerning the value of the millions of restricted

Indigo-Energy shares he received. He testified he "can't do

anything with them, they're worthless." He stated "[t]he value

right now is zero. In fact we're getting sued by the receiver for

these shares." Defense counsel objected, arguing the shares were

now "trading at 49 cents a share."

 Both counsel agreed to the trial court striking plaintiff's

answer and instructing the jury "[t]hat the stock that the witness

just spoke about, he cannot sell . . . because a governmental

representative is trying to repossess the stock."

 On cross-examination, defense counsel asked plaintiff whether

he had "gone online to determine the price of that stock."

Plaintiff indicated he did not check the price on the shares.

 We find no abuse of discretion because both sides agreed to

the court's instruction and because plaintiff apparently had no

knowledge of the value of the shares. We note that both the value

of the shares and the restrictions on selling them are relevant,

and may be proven through appropriate evidence at a new trial.

17
 Defendant does not challenge, and we do not address, whether
Pompeo gave expert testimony.

 42 A-1064-15T1
 Finally, defendant argues the trial court erred in

prohibiting the parties from using the complaint in cross-

examining plaintiff. He cites that the trial court told the

parties "don't talk about the pleadings in either opening."

However, the court never said anything about not using the

pleadings during cross-examination, nor did defense counsel

attempt to do so.

 In sum, we affirm the motion court's grant of summary judgment

on plaintiff's fraud claim and its imposition of sanctions against

him. We reverse the court's grant of summary judgment on his

aiding and abetting fraud claim, vacate the court's denial of

summary judgment on his negligent misrepresentation claim, and

reverse the denial of summary judgment on his negligence claim.

For those reasons, and because it was prejudicial error to allow

testimony regarding the Consent Order, we reverse the jury's

verdict. We remand for further proceedings on plaintiff's aiding

and abetting fraud claim and on his averment that the non-

disclosure that CMC securities were unregistered and non-exempt

constituted negligent misrepresentation. Affirmed in part,

reversed in part, and remanded. We do not retain jurisdiction.

 43 A-1064-15T1